QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Kevin S. Reed (Bar No. 2639177)
  James Meehan (Bar No. 5417050)
  kevinreed@quinnemanuel.com
  jamesmeehan@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

  Christopher D. Porter (pro hac vice forthcoming)
  chrisporter@quinnemanuel.com
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone: (713) 221-7100
Facsimile: (713) 221-7100

  Sean S. Pak (pro hac vice forthcoming)
  seanpak@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

  Lance L. Yang (pro hac vice forthcoming)
  lanceyang@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Plaintiff Saft America Inc.*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAFT AMERICA INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>BREN-TRONICS, INC.,<br><br>                    Defendant. | Case No. _____<br><br>**COMPLAINT** |

Plaintiff Saft America Inc. ("Saft"), by and through its undersigned attorneys, brings this action against Bren-Tronics, Inc. ("Bren-Tronics"), and for its Complaint alleges as follows:

**<u>INTRODUCTION</u>**

1.      This is an action for trade secret misappropriation, which seeks to protect the valuable intellectual property rights of Saft, a leading innovator in lithium-ion battery technology. Saft brings this lawsuit to prevent a theft of Saft's trade secrets for the Saft Xcelion 6T® Battery ("Xcelion battery") by Bren-Tronics, and to thereby protect the substantial investment of resources and years of hard work of Saft's employees.

2.      In 2007, Saft set out to develop state-of-the art lithium-ion 6T batteries.  Since then, Saft has introduced several generations of its lithium-ion 6T batteries, with each generation building on the advancements of past generations.  Saft's lithium-ion batteries made major leaps over existing lithium-ion battery technology in numerous aspects, including safety, reliability, capacity, and cost.  Saft introduced the first-of-its-kind Xcelion battery, a smart lithium-ion 6T battery for military ground vehicles, in 2016.  Since then, Saft's Xcelion batteries have been designed into military vehicles worldwide, including in the United States, Australia, Switzerland, France, and Germany.



3.     As a business developing technology often used for national defense, Saft has gone to great lengths to protect its trade secrets.  Among other measures, Saft requires Xcelion battery customers to enter into confidentiality agreements before receiving proprietary information about the battery.  Given the complexity and proprietary nature of the technology in the Xcelion battery, it is not possible to use this battery, much less create a pirated battery, without access to and use of Saft's proprietary information and trade secrets.  Not surprisingly, up until April 2021, Saft was unaware of any other company offering a fully compatible replacement for the Xcelion battery.

4.     But in April 2021, Saft was shocked to learn that Bren-Tronics had not only created a pirated version of the Xcelion battery, but had already targeted Saft's Xcelion business with its pirated battery in at least one bid for a military contract.  In that bid, which is ongoing, Saft had already been selected to supply the Xcelion battery to the Spanish military for a next generation of modern armored combat vehicles.  Saft's battery had been successfully integrated into combat vehicles and tested and qualified for safety and performance.  However, at the eleventh hour, Bren-Tronics is seeking to displace Saft's Xcelion battery with its BT-70939M-BP(H) battery, alleging that this pirated battery is easy to swap into vehicles already designed for the Xcelion battery.

5.      Saft welcomes fair competition but cannot tolerate theft.   Bren-Tronics'
misappropriation and attempts to profit from Saft's innovation must be enjoined.

## THE PARTIES

6.      Plaintiff Saft America Inc. is a corporation organized under the laws of the State of
Delaware, with its principal place of business located at 13575 Waterworks Street, Jacksonville,
FL 32221.

7.      Upon information and belief, Defendant Bren-Tronics, Inc. is a corporation
organized under the laws of the State of New York, with its principal place of business located at
10 Brayton Court, Commack, NY 11725-3197.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over the claims asserted herein under 18
U.S.C. § 1836(c) and 28 U.S.C. §§ 1331 and 1367.  The Court also has subject matter jurisdiction
under 28 U.S.C. § 1332 because Saft and Bren-Tronics are citizens of different States.

9.      This Court has personal jurisdiction over Bren-Tronics because Bren-Tronics has
continuous and systematic contacts with the State of New York, including because its principal
place of business is located in this judicial district.

10.      Venue is proper in this District under the provisions of 28 U.S.C. § 1391(b) because
a substantial portion of the events or omissions giving rise to the claims occurred in this judicial
district and Defendant Bren-Tronics resides in this District for the purposes of 28 U.S.C. § 1391.

## FACTS

### I.      The History of Saft

11.      Saft has a long history of innovation in the design and development of batteries,
dating back to the founding of its parent company in 1913.  From nickel, to cadmium, to lithium
and lithium-ion batteries, Saft has been at the forefront of battery and battery cell technologies

across the decades.  From its earliest production and commercialization of nickel-based batteries in 1918, Saft's battery technology has powered all kinds of commercial, industrial, space, and defense applications in the United States and across the world.

12.     Saft's presence in the United States dates back to the 1950s.  Since 1975, Saft has manufactured batteries at its factory in Valdosta, Georgia.  Since 1978, it has manufactured batteries at its factory in Cockeysville, Maryland.  And, since 2011, it has also manufactured batteries at its factory in Jacksonville, Florida.  The advanced manufacturing facilities in Jacksonville hosted President Obama in 2016, a visit that attracted attention from national media.

**II.     Designing and Commercializing the Saft Xcelion 6T® Battery**

13.     The Xcelion battery exemplifies Saft's history of innovation.  Prior lead-acid 6T batteries were "dumb" devices like the lead-acid batteries found in cars.  Saft wanted to create a battery with advanced features and the ability to communicate with the electrical system of the vehicle.  Saft wanted to replace lead-acid batteries traditionally used in military vehicles with a battery delivering capacity and output surpassing those traditional batteries at a fraction of the weight.  These efforts culminated in the Xcelion battery.

14.     Incorporating a decade of battery advancements in rechargeable lithium-ion 6T batteries, the Xcelion battery is a smart battery for military applications that includes electronics and software that greatly improve its performance and reliability while remaining cost competitive. As the first successful lithium-ion drop-in replacement battery for lead-acid 6T batteries traditionally used in military ground vehicles, the Xcelion battery was the first of its kind and positioned Saft as the market leader in this application.

15.     The process of designing and commercializing the Xcelion battery was an iterative process, with several distinct phases, and it remains ongoing.  Saft's scientists have already spent

over tens of thousands of hours in designing and commercializing the technology embodied by the Xcelion battery.

16.     **Concept.**  Because many of Xcelion's features had never existed in a 6T battery, Saft's scientists had to conceptualize many of the key electronics and physical battery properties that would later be introduced in the Xcelion battery.  These included a proprietary set of specifications, unique functions performed by the smart battery, critical operational modes for the battery—many of which exist only in the Xcelion battery—and communication interfaces facilitating the battery's communication with a vehicle into which the battery is embedded.  Saft created the messaging and command/response protocols that enable the battery's operation in demanding military contexts, while maximizing its performance and reliability.

17.     **Prototype.**  Original prototyping leading to a critical design review was completed in 2014.  This prototype development included serially building several iterations of prototypes to prove that the concept worked, and improving and refining the concept and prototype design for the target market.

18.     **Testing and Evaluation.**  An additional year of testing and evaluation of the battery took place before the Saft Xcelion 6T® Battery could be released for commercial sale in 2016.  This testing and evaluation led to refinement of Saft's internal specifications, including expected improper operating conditions and electromagnetic interference (EMI) testing to baseline Army Ground limit.  Even after the commercial release of the Xcelion battery, Saft implemented several improvements to the design.  Collectively, Saft's testing and evaluation allowed it to refine the specifications, functions, operational modes, and communication interfaces previously conceptualized and prototyped.

19.     **Manufacturing.**  Saft's manufacturing flow for the Xcelion battery includes digital tracking of component traceability and automated acceptance testing for battery performance, including overload and engine starting load verification.

20.     **Commercialization.**  Commercializing a smart battery designed for use in military ground vehicles such as the Xcelion battery is a difficult endeavor.  Among other things, it requires validating the battery with real-world military vehicles and convincing national militaries and defense contractors that the Xcelion battery performs as required in every potential setting a military vehicle might encounter.  Saft's successful commercialization of the Xcelion battery allowed Saft to obtain national and NATO stock numbers that establish the Xcelion battery as a stock part for use by the national militaries of NATO members.  Saft first obtained these important stock numbers through the British Ministry of Defence in 2014.  Through these stock numbers, Saft is positioned to sell its Xcelion battery not just by selling the battery to defense contractors who embed it in new military ground vehicles sold to various national militaries, but also by selling the batteries directly to those national militaries to enable upkeep of existing vehicles that use the Xcelion battery.

21.     **Ongoing Validation.**  Even after the battery was commercially released, given the high demands of Saft's military customers, validation of the battery is regularly performed in the context of specific bids.  For example, Saft began validating the Xcelion battery for use in Spanish military armored vehicles as part of a bid by a joint venture of four defense contractors—General Dynamics European Land Systems-Santa Bárbara Sistemas ("GDELS-SBS"), Indra Sistemas, Sapa Placencia, and Escribano Mechanical & Engineering (collectively, the "JV")—beginning in 2017.  Saft continues to perform ongoing validation of the Xcelion battery for various applications.

As explained further below, the bid including Saft's battery was only completed and accepted by the Spanish military in August 2020.[1]

### III.   Saft Replaces Bren-Tronics In Bid To The Spanish Government Only To Have Bren-Tronics Come Out With A Pirated Battery

22.     In 2020, the JV submitted a bid to supply the Spanish military with a new generation of modern armored combat vehicles.  These vehicles would feature lithium-ion 6T batteries, as opposed to lead-acid 6T batteries.

23.     Saft's Xcelion battery was one of two batteries the JV considered for the bid.  The other battery under consideration was a battery offered by Defendant Bren-Tronics.  Early in the process, the Bren-Tronics battery exhibited reliability issues (such as failure to start the vehicle) as well as inadequate results from abuse testing and was abandoned by the JV.

24.     JV member GDELS-SBS selected the Xcelion battery for the demonstration phase of the Spanish bid in 2017.  Years of extensive testing and validation of the vehicles including the Xcelion battery was performed for the bid to the Spanish military.  This testing and validation required Saft to submit proprietary information, under strict confidentiality obligations, to the JV to enable the JV to integrate the battery into its vehicles, including to ensure the vehicle systems could communicate, control, and monitor the Xcelion battery via a proprietary communications interface.  Vehicles with Saft's Xcelion battery successfully completed the testing and validation phase.

25.     Thanks in part to the successful integration and validation of the Xcelion battery as part of the JV's vehicle, the Spanish military awarded the contract for military ground vehicles to the JV in August 2020.

---

[1]   *See* https://www.gd.com/Articles/2020/08/25/gdels-awarded-contract-for-348-spanish-8x8-combat-vehicles.

7

26.     In January 2021, however, GDELS-SBS informally and unexpectedly notified the JV that it no longer intended to use the Xcelion battery for the project.  Instead, they would be using a battery offered by Bren-Tronics.  In April 2021, Saft learned that Bren-Tronics' offered battery, called the BT-70939M-BP(H), was alleged to be a fully compatible, drop in replacement—*i.e.*, a "plug-and-play" replacement—for the Xcelion battery, and that Bren-Tronics' battery was thus a pirated version of the Xcelion battery .

IV.   **Saft's Efforts to Maintain the Secrecy of Its Proprietary Information**

27.     During the past decade, Saft has developed substantial volumes of valuable, proprietary intellectual property.  With the exception of its published patents and patent applications and carefully chosen information disclosed on its website and other promotional materials, Saft maintains confidentiality and secrecy over its intellectual property using physical security measures, document marking, electronic security measures, and legal security measures.

28.     **Saft's Physical Security Measures.**  Saft has implemented a number of security policies and practices at its physical offices, including but not limited to physical access restrictions, access logging, and closed-circuit monitoring of facilities.

29.     **Saft's Document Marking.**  Saft employees are instructed to use document templates that are stamped "Proprietary Information" or "Confidential" when preparing reports and other documents that contain, reveal, or reflect sensitive or proprietary intellectual property. For example, the Xcelion battery user's manual that explains to a customer how to use the battery bears a "Proprietary Information" stamp on each and every page.  Similarly, the Xcelion battery Interface Design Description that explains to a customer how electronic communications with the battery operate bears a "Proprietary Information" stamp on each and every page.

30.     **Saft's Electronic Security Measures.**  Saft has installed a number of electronic security measures to control access to its confidential and proprietary information, including but not limited to firewalls, access controls, security software, access logging, and encryption.

31.     **Legal Security Measures.**  In addition to physical and electronic security, and document marking, Saft also employs a number of legal security measures to protect the secrecy of its intellectual property, including but not limited to employee agreements, corporate policies, and exit interview processes:

32.     **Confidentiality and Non-Disclosure Agreements.**  Saft enters into confidentiality and non-disclosure agreements with customers of the Xcelion battery, and it provides customers information related to this battery subject to the customers' confidentiality and non-disclosure obligations.

33.     In short, Saft has implemented appropriately rigorous security measures to maintain confidentiality over the valuable intellectual property it has developed in connection with the Xcelion battery over the last several years.

## V.     The Trade Secrets at Issue

34.     The complicated nature of a complex, confidential product such as a drop-in smart lithium-ion battery for military vehicles makes it impractical to describe every single stolen Saft trade secret in this Complaint.  In brief, Saft's trade secrets enable numerous features of the Xcelion battery, including use of CAN bus communication to view, monitor, and control detailed battery information and features; communication of battery state of charge, temperature, and other key parameters using the J1939 CAN bus protocol; provision of a host of state-of-the-art protections for the battery, including protections for redundant overcharge, overload, short-circuit, over-discharge, and battery reserve protection to preserve energy for engine start; inclusion of built-in-

testing; use of cell heating to allow full battery capability over operating temperature; and use of automatic cell balancing.

35.     Saft owns and possesses certain confidential, proprietary, and trade secret information including proprietary techniques, implementations, methods, and processes including proprietary combinations of information, all of which are embodied in the Xcelion battery and can be broadly categorized into at least four general categories of trade secrets: battery physical interface, signal interface, communications interface, and battery behavior.  These trade secrets are also described in more detail in compilations or combinations of technical documentation, source code, programs, compilations, internal communications and documents, product documentation, and confidential marketing information, strategic plans, and presentations that contain or reveal the content and operation of the Xcelion battery, including the user's manual and the Interface Design Description.

36.     **Category 1: Battery Physical Interface.**  The battery physical interface includes a communications connector never before used in a military vehicle-starting battery.  It is configured to support ON/OFF control with either Legacy Mode or Smart Mode as needed, support connector-based addressing so that each battery's communications data can be correlated to its physical location, and provide the physical connection to the Saft proprietary CAN signals.

37.     **Category 2: Signal Interface.**  The signal interface to the battery consists of specific levels of signal voltage and polarity to control ON/OFF and Addressing functions, as well as the CAN bus 2.0b signals.

38.     **Category 3: Communications Interface.**  The communications interface consists of 19 messages generated by Saft engineers, which are J1939 proprietary messages.  These messages are not part of the standard SAE message protocol, but instead are manufacturer-specific.

Each message includes multiple pieces of information that are encoded specifically according to range, offset, resolution, units, and data length values that are defined in the proprietary message protocol. The messages were defined to enable the control and reporting of the unique features of the Xcelion battery.

39. **Battery Behavior.** The Xcelion battery implements many unique functions and modes of operation that are useful to a military vehicle-starting battery, using proprietary techniques, implementations, methods, and processes to implement such functions and modes of operation.

40. Each of these categories of information is valuable to Saft specifically because it is confidential and proprietary. The Xcelion battery designs reflect many years spent developing, prototyping, and testing the battery. As long as the concepts underlying the Xcelion battery, and the designs built on those concepts, remain confidential to Saft, then only Saft benefits from that work. However, once these trade secrets and confidential information are improperly taken and used by a competitor, then the competitor—in this case Bren-Tronics—unfairly benefits from Saft's work. The competitor not only saves significant resources by avoiding the development process and testing that Saft invested in, but also saves critical time by building a finished battery much more quickly than otherwise would be possible for deployment early in a competitive market.

## VI. Bren-Tronics' Use of Saft's Trade Secrets

41. On information and belief, Bren-Tronics marketed the BT-70939M-BP(H) battery to the JV as a plug-and-play replacement for the Xcelion battery in the Spanish bid after the Xcelion battery had already been successfully integrated into combat vehicles and tested and qualified for safety and performance.

42.     On information and belief, Bren-Tronics had no battery that was competitive to the Xcelion battery—much less a plug-and-play replacement battery for the Xcelion battery—when the JV rejected the battery Bren-Tronics originally submitted for the bid to the Spanish military in favor of the Xcelion battery due to the Bren-Tronics' battery's extreme lack of reliability, which caused it to catch fire or explode under test conditions expected to be encountered by the military ground vehicles.  Yet, after validation of the Xcelion battery had been successfully completed as part of the JV's bid to the Spanish government, a new Bren-Tronics battery was selected as a plug-and-play replacement for Saft's battery by JV member and defense contractor GDELS-SBS.

43.     On information and belief, Bren-Tronics could not have developed a battery as a fully compatible replacement for Saft's battery without using Saft's trade secrets.  For example, because the Xcelion battery has been tested and validated as part of the vehicles it is designed to work in, including to ensure the vehicle systems can communicate, control, and monitor the Xcelion battery via a proprietary communications interface, in order to be a plug-and-play replacement battery for the Xcelion battery that interfaces with military vehicles in the same way as the Xcelion battery, knowledge of Saft's proprietary and trade secret information is required to ensure, for example, that the plug-and-play replacement can communicate seamlessly with vehicle systems designed to incorporate the Xcelion battery.  Similarly, knowledge of the Xcelion battery's proprietary battery behavior is needed, and a high degree of similarity in battery behavior is required between Saft's Xcelion battery and Bren-tronics' pirated battery for a vehicle designed to incorporate the Xcelion battery, which has expectations for how the battery will operate in various modes or conditions of operation, to work seamlessly with Bren-Tronics' battery.  In sum, these batteries are used in complex military vehicles being developed by a joint venture of four defense contractors and the batteries must communicate with the vehicles electrical systems and respond

to computer commands designed to improve the performance and reliability of the battery in the way the vehicles are designed to expect. Saft has never sold a Xcelion battery, much less disclosed technical documentation related to that battery, to Bren-Tronics.

44.     On information and belief, Bren-Tronics' attempt to supplant Saft's batteries in the bid for the Spanish military was only made possible by Bren-Tronics' misappropriation of Saft's trade secrets related to the Xcelion battery. This usurpation stands to deprive Saft of the contract to supply the Spanish military. It further stands to provide Bren-Tronics a brand-new foothold in a market in which Saft has, to date, been the undisputed market leader. This market includes not only the supply of batteries as part of new vehicles purchased by militaries from defense contractors across the world, but also the ongoing supply of replacement batteries directly to those militaries for their upkeep of vehicles that use the Xcelion battery.

**FIRST CAUSE OF ACTION**
**Violation of Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.***

45.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

46.     The information Bren-Tronics misappropriated constitutes protectable trade secrets owned by Saft, as set forth in 18 U.S.C. § 1839(3). On information and belief, Bren-Tronics has misappropriated at least the following trade secrets from Saft:

        a.   Battery physical interface;

        b.   Signal interface;

        c.   Communication interface; and

        d.   Battery behavior.

47.     On information and belief, Bren-Tronics' theft of Saft's trade secrets goes well beyond the specific examples of trade secrets identified here, as will be demonstrated after Saft receives discovery in this litigation.

48.     Saft has taken reasonable measures to protect the confidentiality of its trade secrets, including through the measures alleged above.  Saft does not and did not consent to the use of any of its trade secrets by anyone other than authorized personnel using them within the scope of their duties for Saft or authorized third parties using them within the scope of their confidentiality obligations to Saft.

49.     Saft's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

50.     On information and belief, Bren-Tronics misappropriated Saft's trade secrets using the improper and unlawful machinations alleged herein.  Bren-Tronics' misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive.

51.     On information and belief, if Bren-Tronics is not enjoined, it will continue to misappropriate and use Saft's trade secret information for its own benefit and to Saft's detriment, and may disseminate Saft's trade secrets to other third parties who have no right to access or use Saft's trade secrets.

52.     As the direct and proximate result of Bren-Tronics' conduct, Saft has suffered and, if Bren-Tronics' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Because Saft's remedy at law is inadequate, Saft seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business

interests.  Saft's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

53.    In addition to equitable relief, Saft demands (i) monetary damages in an amount to be proven at trial, (ii) exemplary damages in an amount equal to two times the amount of its compensatory damages pursuant to 18 U.S.C. § 1836(b)(3)(C), because Bren-Tronics' misappropriation was willful and malicious, and (iii) reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) because Bren-Tronics' misappropriation was willful and malicious.

## SECOND CAUSE OF ACTION
### New York Common-Law Trade Secret Misappropriation

54.    The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

55.    The information Bren-Tronics misappropriated constitutes protectable trade secrets owned by Saft.  On information and belief, Bren-Tronics has misappropriated at least the following trade secrets from Saft:

      a.   Battery physical interface;

      b.   Signal interface;

      c.   Communication interface; and

      d.   Battery behavior.

56.    On information and belief, Bren-Tronics' misappropriation of Saft's trade secrets goes well beyond the specific examples of trade secrets identified here, as will be demonstrated after Saft receives discovery in this litigation.

57.    Saft has taken reasonable measures to protect the confidentiality of its trade secrets, including through the measures alleged above.  Saft does not and did not consent to the use of any of its trade secrets by anyone other than authorized personnel using them within the scope of their

duties for Saft or authorized third parties using them within the scope of their non-disclosure agreements with Saft.

58.    Saft's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

59.    On information and belief, Bren-Tronics misappropriated Saft's trade secrets by improper means, knowing or having reason to know that the trade secrets were acquired by improper means.  Bren-Tronics' misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive.

60.    On information and belief, if Bren-Tronics is not enjoined, it will continue to misappropriate and use Saft's trade secret information for its own benefit and to Saft's detriment, and may disseminate Saft's trade secrets to other third parties who have no right to access or use Saft's trade secrets.

61.    As the direct and proximate result of Bren-Tronics' conduct, Saft has suffered and, if Bren-Tronics' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Further, Bren-Tronics has been unjustly enriched through its misappropriation of Saft's trade secrets.

62.    Because Saft's remedy at law is inadequate, Saft seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests.  Saft's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

63.    In addition to equitable relief, Saft demands (i) monetary damages in an amount to be proven at trial, (ii) exemplary damages in an amount equal to three times the amount of its

compensatory damages, because Bren-Tronics' misappropriation was willful and malicious, and (iii) reasonable attorneys' fees because Bren-Tronics' misappropriation was willful and malicious.

### THIRD CAUSE OF ACTION
### Unfair Competition Under New York Law

64.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

65.     As described more fully above, Saft possesses trade secrets and confidential information relating to Saft's proprietary business practices, namely its Xcelion battery.  Saft's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

66.     Saft has expended millions of dollars and tens of thousands of hours of employee effort to create and develop the Xcelion battery and it would be exceedingly difficult—if not impossible—for a competitor, or any other party, to create, develop, or cultivate the same information that is part of the Xcelion battery designs and specifications.

67.     Saft has taken reasonable measures to protect the confidentiality of its trade secrets, including through the measures alleged above.

68.     On information and belief, Bren-Tronics misappropriated Saft's trade secrets by improper means, knowing or having reason to know that the trade secrets were acquired by improper means.  Bren-Tronics' misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive.

69.     Because such acts of misappropriation were done with a conscious disregard of Saft's rights and a desire to profit from such misappropriation while causing Saft competitive harm, the acts of misappropriation were done in bad faith, and Bren-Tronics has acted unfairly.

70.     Because Bren-Tronics has used Saft's trade secrets and confidential information for its own benefit, Bren-Tronics has made an unjustifiable attempt to profit from Saft's expenditure of time, labor, and talent.

71.     Bren-Tronics thus committed the intentional tort of unfair competition.

72.     As the direct and proximate result of Bren-Tronics' unfair competition, Saft has suffered and, if Bren-Tronics' conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  Further, Bren-Tronics has been unjustly enriched as a result of its unfair competition.

73.     Because Saft's remedy at law is inadequate, Saft seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its trade secrets and to protect other legitimate business interests.  Saft's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

74.     In addition to equitable relief, Saft demands (i) monetary damages in an amount to be proven at trial and (ii) reasonable attorneys' fees because Bren-Tronics' misappropriation was willful and malicious.

<u>**FOURTH CAUSE OF ACTION**</u>
**Tortious Interference with Prospective Business Relations**

75.     The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.

76.     Saft and the JV entered into a business relationship in 2017 when the JV selected Saft's Xcelion battery for its bid to the Spanish military.

77.     Saft reasonably had a high expectation of future profits as a result of its business relationship with the JV, as demonstrated in part by the Spanish military's acceptance of the JV's bid in August 2020, as alleged herein.

78.     Bren-Tronics knew that Saft and the JV had an existing business relationship.

79.     Specifically, and without limitation, upon information and belief, Saft and Bren-Tronics were the only two companies that the JV considered for its bid.  Upon information and belief, the JV informed Bren-Tronics in 2017 that its battery would not be selected after the battery exhibited reliability issues.

80.     Saft would have continued its business relationship with the JV but for Bren-Tronics' wrongful and intentional misconduct.

81.     Specifically, and without limitation, Bren-Tronics intentionally and maliciously interfered with Saft's business relationship with the JV—despite its knowledge of the relationship—by marketing its BT-70939M-BP(H) battery to the JV as a replacement to Saft's Xcelion battery after the JV already had selected Saft's Xcelion battery and after Saft had expended great efforts and economic cost in connection with the JV's bid to the Spanish military.

82.     Upon information and belief, Bren-Tronics never informed the JV that its BT-70939M-BP(H) battery was developed using Saft's trade secrets.

83.     Bren-Tronics' intentional interference was successful, as a JV member informed Saft in January 2021 that the JV no longer intended to use the Xcelion battery for its project with the Spanish military.

84.     Bren-Tronics engaged in the acts of interference set forth herein with a conscious desire to displace Saft as the JV's battery-supplier-of-choice and prevent the Saft-JV relationship from occurring or continuing, or knew that its interference was certain or substantially certain to occur as a result of its conduct.

85.     As the direct and proximate result of Bren-Tronics' interference, Saft has suffered and, if Bren-Tronics' conduct is not stopped, will continue to suffer, severe competitive harm,

irreparable injury, and significant damages, in an amount to be proven at trial.  Further, Bren-Tronics has been unjustly enriched as a result of its interference.

86.     Because Saft's remedy at law is inadequate, Saft seeks, in addition to damages, preliminary and permanent injunctive relief to prevent Bren-Tronics from continuing to interfere in its business relationship.  Saft's business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

87.     In addition to equitable relief, Saft demands (i) monetary damages in an amount to be proven at trial and (ii) reasonable attorneys' fees because Bren-Tronics' interference was willful and malicious.

## PRAYER FOR RELIEF

**WHEREFORE**, Saft prays that the Court grant the following relief:

A.     That judgment be entered in favor of Saft and against Bren-Tronics on Saft's claim asserted in this Complaint;

B.     That the Court issue preliminary and permanent injunctions against Bren-Tronics, forever barring Bren-Tronics from (1) using Saft's trade secrets or any derivative thereof; (2) requiring Bren-Tronics to return to Saft any and all documents and information that reflect Saft's trade secrets; and (3) selling any products developed with the use of Saft's trade secrets.

C.     That the Court award to Saft such compensatory damages as may be proven at trial, in accordance with each of the claims asserted in this Complaint, plus the amount Bren-Tronics was unjustly enriched by the misappropriation;

D.     That the Court award to Saft double the damages proven at trial on Saft's claim under the Defend Trade Secrets Act claim and/or treble the damages proven at trial on Saft's New York common-law trade secret misappropriation claim;

E.      That the Court award to Saft exemplary and punitive damages as are available by statute or by common law in an amount as may be awarded at trial;

F.      That the Court award to Saft pre-judgment and post-judgment interest on all damages awarded;

G.      That the Court award to Saft reasonable attorneys' fees and costs where provided by law, including pursuant to 18 U.S.C. § 1836(b)(3)(B);

H.      That the Court award to Saft costs and expenses in this action;

I.      That the Court award to Saft such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Saft hereby demands trial by jury of all issues properly triable thereby.

Dated:  June 11, 2021                    Respectfully submitted,

                                         QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                         By:   _/s/ James Meehan_

                                             Kevin S. Reed (admission in process)
                                             James Meehan
                                             kevinreed@quinnemanuel.com
                                             jamesmeehan@quinnemanuel.com
                                             51 Madison Avenue, 22nd Floor
                                             New York, NY 10010
                                             Tel: (212) 849-7000
                                             Fax: (212) 849-7100

                                             Sean S. Pak (*pro hac vice forthcoming*)
                                             seanpak@quinnemanuel.com
                                             50 California Street, 22nd Floor
                                             San Francisco, CA 94111
                                             Tel: (415) 875-6600
                                             Fax: (415) 875-6700

Christopher D. Porter (*pro hac vice forthcoming*)
christopherporter@quinnemanuel.com
Pennzoil Place, 711 Louisiana Street, Suite 500
Houston, TX 77002
Tel: (713) 221-7000
Fax: (713) 221-7100

Lance L. Yang (*pro hac vice forthcoming*)
lanceyang@quinnemanuel.com
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel: (213) 443-3000
Fax: (213) 443-3100

*Attorneys for Plaintiff Saft America Inc.*